JAMES M. BRACKEN V. ELIJAH HAMBRICK AND ANOTHER.

Verbal contracts for the sale of land, which are sought to be enforced upon
the equitable grounds which relieve them against the operation of the
statute of frauds requiring them to be in writing, must in their terms be
certain and unambiguous; and if not made out by satisfactory proofs, a
specific performance will not be decreed.

If the contract be so uncertain that the court cannot say what its precise
import and limitations are, then the court will withhold a final decree for
a specific performance.

The terms of the contract should be set out, and made manifest, so that the
court can say what are its precise import and limitations.

APPEAL from Lamar.    Tried below before the Hon. W. S.
Todd.

The jury found a verdict for the defendants, upon which the
court decreed the tract of land in controversy to the defendants,
and also decreed to the plaintiff the house and lot known as the
"Goshen House."    All the other facts are sufficiently stated in
the opinion.

*Johnson & Townes*, for the appellants.

ROBERTS, J.—The appellants brought an action of trespass to
recover of Hambrick a tract of land.    Ewbanks having sold the
land to him comes in as his vendor and defends the action.    He
sets up an equitable title derived from Bracken, the ancestor of
appellants, under whom they claim.    He alleges a contract of
purchase, a payment of the purchase money, possession delivered,
and the making of valuable improvements upon the land by him
and his vendee.    The plaintiffs below amend by stating that
their ancestor entered into a contract for the exchange of lands
with Ewbanks; that their ancestor agreed to give the tract of
land in controversy, 216 acres, a horse, two mules and a note for
$12 50, for which Ewbanks agreed to give a certain house and
lot, called the Goshen house, a certain livery stable and lots, and
a timber tract of twenty acres; that Ewbanks made a title to the

livery stable and its lots, and represented that one Long would make title to the Goshen house, and one Wright to the timber tract, when requested so to do by Bracken; that said Bracken paid the horse and two mules, and retained in himself the title to the two hundred and sixteen acres, the land in controversy, "to provide against all contingencies;" that Long and Wright would not make a title to these premises unless Ewbanks would pay to them respectively certain moneys alleged to be due them for the property; that Ewbanks, though notified, refused to pay said money, and said Bracken was evicted from the house and lot, (the Goshen house.)

Ewbanks in reply to this, states, amongst other things not necessary to be repeated, that he had acquired the Goshen house and lot by an exchange of a five acre lot in Paris, then his homestead, with Kennedy, who purchased it by verbal contract from Long, and though no titles passed between Kennedy and Ewbanks, possession was mutually given; that Bracken at the time of the trade was fully aware of the condition of the title to the Goshen house, and agreed "to take Long for the title thereto;" that he also knew the condition of the title of the twenty acre tract of timber land, and that it was to come from Wright, and Ewbanks tendered a deed for the same to appellants at the term of the court at which the cause was tried. It was proved on the trial that Kennedy failed to pay for the Goshen place, and that Long had sold it and made a title thereto to some third person. The main question in the case, then, arises upon this allegation in reference to the Goshen house,—that Bracken, being fully aware of the condition of the title, agreed to take Long for the title to it. In support of this allegation, a witness, the brother of Ewbanks, stated that "Bracken agreed that he would take Jake Long for the title to the Goshen property and that he would look to George W. Wright for title to the twenty acres of timber land, and released his brother;" and further, he stated that "old man Bracken said he knew all about the condition of the titles to the property." This witness proves literally the allegation as made; except that he does not disclose the facts which Bracken did know in relation to the title of the property. Bracken professed to know all the

the facts in relation to the condition of the title. That he proves, but not what those facts were.

Bracken may have supposed that he knew all the facts, when in fact he may not have known only a portion of them. But admitting all the facts to have been known, the allegation and proof of the agreement, that Bracken would take Long and look to Wright for the title to the property, considered in reference to the facts of the transaction, may mean one thing or another, according to the understanding of the parties, with reference to which they made the trade. For instance if he, Bracken, knew that Long had made no written contract with Kennedy for the Goshen place, and had not been paid for it, and that no written agreement had passed between Kennedy and Ewbanks for the place, and that Ewbanks had made to Kennedy no title for the five acre lot given in exchange for it, and knowing these facts assumed, in the trade, to risk the good faith of all parties in carrying out their verbal agreements, by paying what was due, making titles and the like, and also to release Ewbanks from all further responsibility under all contingencies, whether or not he entirely failed to make Kennedy a title to the five acre lot, and Kennedy failed to pay Long, or whether or not he failed to pay Wright for the twenty acre tract of land; and whether or not by any of these means he, Bracken, should utterly fail ever to get a title to the Goshen place, or to the twenty acre tract, or both of them, then this allegation would embrace a state of facts that would support the verdict for the defendant. Upon such a supposition, the conclusion would be that Bracken had voluntarily incurred a reckless risk, or that he had made such a bargain as that he could afford to take the risk of getting a title, without relying on the good faith of the parties in performing their verbal agreements as a part of the contract. The other evidence in the case tends strongly to contradict the conclusion that this trade was made with any such understanding as this. It is shown that Ewbanks, about the time of the trial, paid Wright for the twenty acre tract, and procured him to execute a deed to the heirs of Bracken; also, that in 1857, after this suit was brought, he executed a title bond to Kennedy for the five acre lot, given in exchange for the Goshen place. Why were these acts done, if it

was the understanding of the parties that Ewbanks was, from the day of the trade, released from any further obligation to do any thing at all under all contingencies? Further, there is not alleged or proven any such inequality in the value of the property respectively by each party exchanged, as to induce the supposition that either party understood himself as assuming a risk in getting a good title for the property exchanged.

The allegation that Bracken agreed to take Long for the title to the Goshen place, may be understood to mean (what would be quite different,) that Bracken, relying upon the good faith and punctuality of all the parties contracting, and who had contracted about this property, in performing their verbal contracts, by which he would get a title to the Goshen place and timber land, agreed that he would receive a title directly from Long and Wright without any deed or warranty of any kind, as to the title from Ewbanks. The predicate of such a contract would be, whether expressed or implied, that Ewbanks should pay Wright for the timber land, and procure Kennedy to pay Long for the Goshen place, so that they would be under obligation to make titles.

Or it may mean, that upon the understanding implied from the circumstances, that Ewbank and Kennedy would pay Wright and Long the money respectively due from them under their verbal agreements; that Bracken would take Long and Wright for the titles and risk their performance of their contracts, notwithstanding they were verbal, and risk the title they could make without any warranty from Ewbanks. This may suffice to show how uncertain is this allegation and the corresponding proof of it, upon which the defendant below has resisted a legal title and procured a decree for the specific performance of a verbal contract for the sale of land. The grounds upon which the defendant relied to obtain this decree, were his being put in possession of the land under a verbal agreement of sale, with the terms of which he has wholly complied; that he has been relieved from the operation of the statute of frauds, which requires his contract to have been in writing, by a performance of a parol contract on his part. "An agreement to be entitled to be carried into specific performance, ought to be certain, fair and just in all its parts." (2 Story's

Eq. Jur., sec. 769.) "If the terms are uncertain or ambiguous, or not made out by satisfactory proofs, a specific performance will not (as indeed upon principle it should not,) be decreed. The reason would seem obvious enough ; for a court of equity ought not to act on conjectures, and one of the most important objects of the statute was to prevent the introduction of loose and indeterminate proofs of what ought to be established by solemn written contracts." (Id., 763.) If the contract be so uncertain that the court cannot say what its precise import and limitations are, then the court will withhold a final decree for a specific performance. (Id., 764.)

The contract, as alleged in this case, is ambiguous, and the proof is as general, loose and indeterminate, as the allegation of the party setting it up. This is particularly the case, if it be interpreted to embrace such state of facts as will alone sustain this verdict, as before explained in this opinion.

What the terms of the contract really were, should be set out and made manifest, so that the court can say what are its precise import and limitations. It should not be left to conjecture from the vague and ambiguous allegation, that Bracken, "in his trade with this defendant agreed to take said Long, agent as aforesaid, for the title to said house and lot."

If it was really the understanding of the parties in making this exchange of property, that Ewbanks, upon executing a title for the livery stable and lot, had done and performed every thing he was bound to do, under all contingencies, and that the contract was to be fully binding on Bracken, notwithstanding Ewbanks might never pay Wright for the twenty acre tract, and might never cause Kennedy to pay Long for the Goshen place ; or if there was any other understanding of the parties entering into the contract by which Ewbanks was unconditionally released from all further contingent responsibility, it should have been fully and plainly alleged by the defendant, and established by the proof, in order to make out an equitable defence, which would resist the legal title against him. The most that the facts show with certainty in favor of Ewbanks, is a part performance of the verbal contract of purchase, by being placed in possession of the two

hundred and sixteen acres of land, by having executed a title for the livery stable and lot, and by having shown a readiness to cause a title to be made to the twenty acre tract from Wright to the heirs of Bracken. This part performance may place Ewbanks in such situation as to be a fraud upon him unless the agreement is fully performed by decreeing him a title, if he will still perform the balance (if any thing) of what he was bound to do, or if that be now impracticable, will make compensation in damages for such failure. (2 Story's Eq., 761 and 796.) If the heirs of Bracken have never received, and cannot now obtain a title to the Goshen place, and it has become wholly lost to them, (as it would seem to be from the evidence,) and if by the true spirit of the contract Ewbanks was expressly or impliedly responsible for Kennedy's failure to pay Long for the property, which failure caused the loss, then equity would require that Ewbanks should make good the loss by compensation in damages for it, or by procuring the title to be made now, with remuneration for being deprived temporarily of the property, or by some such equitable adjustment of the rights of the parties. He who seeks to resist a plain legal right must show fully and clearly that he stands on equitable ground; and if all has not been done which equity requires, it must be completed in some way or other so as to make a complete adjustment of the subject matter.

It may be, on the other hand, upon a proper state of pleading, that the heirs of Bracken might be required to reconvey the livery stable and lots upon equitable terms, if the contract cannot be specifically enforced. But the present attitude of the case does not require this matter to be now examined into.

We are of opinion that the judgment should be reversed and the cause remanded.

Reversed and remanded.