"MOORE" BURGER, INC., Appellant,

v.

PHILLIPS PETROLEUM COMPANY et al., Appellees.

No. 11826.

Court of Civil Appeals of Texas, Austin.

July 14, 1971.

Rehearing Denied Sept. 20, 1971.

Philip W. Gilbert, Mitchell, Gilbert & McLean, Austin, for appellant.

John W. Stayton, Stayton, Maloney, Black, Hearne & Babb, Austin, for Phillips Petroleum Co.

James M. Steed, Palmer & Steed, Austin, for Albert E. Craus.

Coleman Gay, Austin, for C. Milton Dowd.

O'QUINN, Justice.

This case is on appeal from a summary judgment, granted on motions of defendants below, that plaintiff take nothing.

The ultimate question is whether the summary judgment proofs conclusively negate at least one of the essential elements of plaintiff's cause of action. We have decided that question against the plaintiff and will affirm the judgment of the trial court.

The appellant, plaintiff below, is "Moore" Burger, Inc., the corporate successor of "Moore" Burger, a partnership, which began a restaurant business in Austin, on one of the tracts of land involved in this case, in 1959. The stock of the corporation is owned by W. D. Scallon, Jr., who is president of the company.

Appellees, who were defendants below, are Albert E. Craus, C. Milton Dowd, and Phillips Petroleum Company.

Appellant brought this lawsuit in 1969 alleging that Craus and Dowd induced appellant in 1967 not to bid on, or make an attempt to buy, the tract upon which its place of business was located, when offered for sale by the City of Austin, on the promise and agreement of Craus and Dowd that they would acquire the adjoining tract and lease that site, and a restaurant building they would erect on it, to appellant for twenty years, in order to make the tract appellant then occupied available to Phillips Petroleum for a service station. Appellant further alleged that it allowed Craus and Dowd to acquire the City of Austin tract without competition from appellant, and that Craus and Dowd also acquired the adjoining tract but sold both pieces of land to Phillips for a service station, and that Phillips then ousted appellant from the City tract on which it had conducted its

business since 1959. Appellant alleged also that Phillips Petroleum took the two tracts of land with actual or constructive notice of appellant's claims with respect to the City tract, which appellant was occupying, and, in negligent disregard of appellant's rights, failed to make inquiry as to appellant's rights in both tracts.

Appellees raised defenses under the statute of frauds (Section 26.01(b) (5), Business and Commerce Code, V.T.C.A.; Acts 1967, 60th Leg., ch. 785) and the statute of conveyances (Article 1288, Vernon's Anno. Civ.Stat.). Appellant contends that its cause of action rests on either or both of two exceptions to these statutes. The first theory of appellant's case is under the doctrine of constructive trust, and the second is under the exception of partial performance found in the rule of Hooks v. Bridgewater, 111 Tex. 122, 229 S.W. 1114 (1921).

Appellant leased from the City of Austin in July, 1959, the initial term being for five years, with an option to renew for an additional five years. The adjoining tract, which is also involved in this lawsuit, was owned by the Ing Estate. Prior to June, 1967, Scallon learned that the City of Austin was considering selling the City tract, which "Moore" Burger, Inc. still occupied under the lease from the City, and on inquiry was advised by the City that he would be given an opportunity to buy the property and that consideration would be given by the City to the fact that "Moore" Burger, Inc., was occupying the premises as the tenant and had a going business located on the City land. Scallon began making arrangements to buy the tract and by June, 1967, had acquired two sources from which he could finance the purchase.

Craus and Dowd, who on at least two prior occasions had jointly acquired service station sites they sold to Phillips Petroleum, undertook prior to June, 1967, to acquire both the City tract and the Ing tract with a view to selling the two properties to Phillips for a station location. In connection with the undertaking, Craus and Dowd

made an agreement with William F. Kemp to act as attorney and trustee for them and to receive title to the properties in Kemp's name as trustee, although Kemp was to have no interest in the sites or in profits realized from the transaction. Pursuant to this arrangement, Craus obtained an option to buy the Ing tract, intending to exercise the option only if he and Craus succeeded also in buying the City tract.

Craus approached Scallon in June of 1967 and learned of Scallon's plans to buy the City tract. Craus then told Scallon that there was no reason for both of them to try to buy the City tract and that if "Moore" Burger, Inc. would refrain from bidding on the property, Craus would buy the land and lease it to "Moore" Burger, Inc., at $250 per month, and thereafter would build a new restaurant on the adjoining Ing tract which Craus would then lease to "Moore" Burger, Inc., under a long term and at a favorable rent. Dowd testified by deposition that from the beginning of their venture he and Craus felt that both the City tract and the Ing tract would be needed for a service station site. Craus testified that he had made a contract to sell both tracts to Broadway Oil Company, a holding company that bought station sites for Phillips, "months before I even met Mr. Scallon."

After several meetings with Craus, Scallon went with Craus to Kemp's law office where a written form of their oral agreement was prepared. Scallon took the draft of their agreement to an attorney, resulting in various changes to which Craus assented. The lease agreement provided that the new building would be placed on the Ing tract, at a cost to lessors of $12,000 to $20,000, and the base rent would be $450 per month, plus one percent per month of the cost above $12,000 for the building, with an initial term of twenty years, and with two five-year renewal options. In addition, the agreement provided that during the first ten years "Moore" Burger, Inc., would have the option to buy that portion of the Ing tract leased for the restaurant, together with the building, for the

price to be paid by Kemp, as trustee, to the City of Austin for the City tract.

The lease agreement referred to the City tract as "Tract I" and to the Ing tract as "Tract II." The agreement recited that "Lessor [William F. Kemp, Trustee] intends to purchase the following described real property (hereinafter sometimes called Tract I) from the City of Austin * * *" and stated further that "Lessee ["Moore" Burger, Inc.] presently has a lease on said property and is in possession of same * * It is the mutual intention and desire of Lessee and Lessor for Lessor to purchase Tract I and to retain Lessee as a tenant, subject to the terms and conditions set forth herein and in the lease contract marked 'Appendix A', attached hereto and incorporated herein by reference."

The instrument further recited that Lessor would make a good faith effort to buy the City tract and that "If Lessor purchases Tract I within two years from the effective date of this agreement, he will promptly offer to lease the same to the Lessee under the terms and conditions set forth in Appendix A." Under the terms of Appendix A, appellant was to have a lease on Tract I, the City tract, at a rental of $250 per month. The primary term was for one year, the lease being automatically renewed and extended for nine consecutive, additional terms of one year each, but appellant could terminate the lease by written notice thirty days before expiration of the primary lease or any renewal term.

With reference to the Ing property, designated as Tract II, the agreement recited that "Lessor further intends to purchase" Tract II, and that "Within one year after Lessor has acquired title to both Tracts I and II (if he has done so within two years of the effective date of this agreement) Lessor will construct a building on Tract II * * * and will lease said Tract II to Lessee for a monthly rental of $450.00 plus 1% per month of the amount, if any, by which the cost of said building exceeds $12,000.00." Lease of Tract II, with the

new building, was to be in accordance with the lease contract found in "Appendix B" attached to the agreement. The agreement further stated that upon execution of the lease on "Tract II and the building agreed to be constructed thereon by Lessor, the lease of Tract I shall be terminated and of no further force and effect, notwithstanding anything to the contrary in this agreement or its appendices."

After completion of the final draft of the agreement, with Appendix A and Appendix B attached, Craus went to Scallon's office and read over the agreement. Scallon signed the agreement. After reading it, Craus told Scallon everything was fine, that the agreement was accepted, and that he would have Kemp sign it. Craus told Scallon that Kemp was the attorney on the deal only and that Craus had full authority to accept the agreement. Craus told Scallon to advise the City officials that "Moore" Burger, Inc., was not going to buy Tract I. Craus testified that prior to this conversation he had already advised the City that Craus and Scallon were engaged in discussions regarding the property.

Meanwhile Craus and Dowd had made a new contract, dated August 24, 1967, to sell both Tract I and Tract II to Broadway Oil Company. Scallon, without knowledge of the contract Craus and Dowd had with Broadway, instructed his attorney to notify the City that "Moore" Burger, Inc., had made a lease agreement with Kemp and would not bid on the City property when offered for sale. The written agreement Scallon had signed was delivered by Craus to Dowd, and the instrument later reached Kemp who kept it in his file.

A short time after Scallon signed the instrument, apparently less than three weeks later, but prior to sale of the City tract, Craus told Scallon that Dowd would call on Scallon to discuss the new building to be placed on Tract II, the Ing land.

When he did call on Scallon, Dowd sought to get Scallon to sign a paper, the purpose of which, Dowd said, was to facilitate financing in connection with construction of the new building, but which Scallon testified " * * * said that I didn't have any interest in the property that I was operating at the time, which was referred to as Tract I in our agreement." Scallon testified that under questioning at the time, both by Scallon and by his attorney, Dowd denied that there "was any problem with this agreement that we had."

By affidavit, Scallon's attorney stated that "I told him [Dowd] that 'Moore' Burger would bid on the premises unless the agreement was unconditionally accepted, and he told me it was." In the same affidavit, the attorney also stated that he talked to Kemp about whether there was a "firm agreement", saying that his client would bid on the City property if there was no such agreement, and that Kemp assured the attorney there was an agreement. Dowd assured Scallon and his attorney that Craus had been authorized to speak for the purchasers in agreeing to the lease agreement with Scallon, but said nothing to them regarding the contract with Broadway, which had already been entered into, to sell both tracts for a service station site.

Thereafter, early in October of 1967, Craus and Dowd bought both Tract I and Tract II, which they later sold to Phillips at a profit.

After he signed the agreement and delivered it to Craus and after advising the City that "Moore" Burger, Inc. would not bid on the City tract, Scallon had difficulty finding Craus to discuss business with him. When he did reach Craus, Craus explained to Scallon that Kemp was out of town frequently, and assured Scallon there was no problem about their agreement and that the lease agreement would be signed. Kemp later began accepting monthly rentals from Scallon at $250 per month, the figure called for under the agreement and the amount appellant had paid the City.

Thereafter, late in February of 1968, Kemp wrote Scallon a letter, purportedly in behalf of Phillips Petroleum, ordering Scal-

lon to vacate the premises (Tract I) by April 1, 1968. Later Kemp admitted that Craus had told him to write the letter, and both Phillips and Kemp have denied there was an attorney-client relationship between Kemp and Phillips.

With this recitation of the facts surrounding the making of the agreement upon which appellant relies, we turn first to appellant's theory of the case grounded on constructive trust.

Appellant argues: "There are two branches of constructive trusts which are applied to enforce agreements to convey or lease real estate, where the agreements would otherwise be unenforcible under the Statute of Frauds. Both branches are applied to defeat fraud, but one branch deals with actual fraud, while the other deals with constructive fraud. * * * Equity will enforce a constructive trust against persons such as Craus and Dowd, who obtain property through fraud and in violation of an otherwise unenforcible agreement * * * Since the record clearly shows actual fraud perpetrated by Craus and Dowd against appellant, the second branch of constructive trusts, involving constructive fraud and the complicated questions of what circumstances create a fiduciary relationship between the parties, will not be discussed * * *" by appellant.

In this position, appellant relies upon Texas Jurisprudence to the effect that "* * * where either party, in reliance on the verbal promise of the other, has been induced to do or to forbear to do any act and thereby his position has been so changed for the worse that he would be defrauded by a failure to carry out the contract, equity will enforce a performance. That is to say, enforcement may be had by a party who has so far performed the agreement on his side or has acted in reliance on it to such an extent that not to enforce the agreement would be inequitable and unjust." 26 Tex.Jur.2d, Frauds, Statute of, sec. 106, p. 271.

A similar contention, in a suit for damages for breach of an oral contract to assign a written lease upon real estate for a longer period than one year, was rejected by this Court in Duke v. Joseph, 213 S.W.2d 535, Tex.Civ.App. Austin, 1948, writ ref.

There the plaintiff urged: "Our courts have repeatedly held that where one party to an oral contract, in reliance thereon, is induced or permitted to place himself in a wrong position so as to constitute a fraud, the courts will then say that the statute of frauds is not applicable." (213 S.W.2d 536, col. 2).

This Court, speaking through Chief Justice McClendon, stated: "We do not question the soundness of this asserted principle as applied to the factual situations in which it was employed in the cited cases. In its broad implications in the abstract, without limitation or qualification, in which Duke [plaintiff] seeks to apply it, and especially as applied to the factual situation he alleges, we confidently assert that it is not now and never has been the law of this State." (213 S.W.2d 537, col. 1).

The language of the principle stated in Texas Jurisprudence, and as urged in Duke v. Joseph, derives from the decision in Morris v. Gaines, 82 Tex. 255, 17 S.W. 538 (1891). This Court distinguished that case, and others which support the principle, from Duke v. Joseph on the basis of differences in the factual situation, calling for application of a different legal principle.

Our further analysis of the cases applying the general principle urged by appellant brings us to the conclusion that the factual situations in those cases are so different as to make the principle inapplicable in the case now under consideration.

■ For a constructive trust to arise there must be a fiduciary relationship before, and apart from, the agreement made the basis of the lawsuit. Consolidated Gas and Equipment Company v. Thompson, 405

S.W.2d 333 (Tex.Sup.1966). In that case the Supreme Court said, " * * * the fact that one businessman trusts another, and relies upon his promise to carry out a contract, does not create a constructive trust. To hold otherwise would render the Statute of Frauds meaningless." (405 S.W. 2d 336, col. 2) ; see also Pennington v. Bennett, 436 S.W.2d 182, Tex.Civ.App. Dallas, 1968, writ ref. n. r. e.

In *Consolidated Gas* the Supreme Court cited five earlier cases decided by that Court since enactment of the Texas Trust Act, including Thigpen v. Locke, 363 S.W. 2d 247 (Tex.Sup.1962) and Gaines v. Hamman, 163 Tex. 618, 358 S.W.2d 557 (1962). The Court pointed out that under *Thigpen* and *Gaines* it was recognized that a fiduciary relationship could arise outside of relations such as that of partners, joint adventurers, attorney and client, and close family ties, " * * * when, over a long period of time, the parties had worked together for the joint acquisition and development of property previous to the particular agreement sought to be enforced." (405 S.W.2d 337, col. 1).

▆▆ An essential element in the creation or existence of a constructive trust is the presence of fraud, either actual or constructive, and the failure alone to discharge a promise of something to be done in the future is not a fraud. Talley v. Howsley, 142 Tex. 81, 176 S.W.2d 158 (1943). In addition to fraud, actual or constructive, there must be a prior fiduciary relationship between the parties.

▆▆ Prior to June of 1967, when Craus first talked to Scallon about the two tracts of land, the parties were not acquainted. By the middle of August following this meeting they had reduced their oral agreement to writing and Scallon had signed the papers. At most they had been acquainted, while working together toward acquisition of the property and entering into a lease arrangement, only a few weeks. This did not constitute a fiduciary relationship, over a long period of time, before and apart from

the agreement made the basis of this lawsuit. Consolidated Gas and Equipment Company v. Thompson, supra; Karnei v. Davis, 409 S.W.2d 439, Tex.Civ.App. Corpus Christi 1966, no writ; Mann v. Risinger, 423 S.W.2d 626, Tex.Civ.App. Beaumont 1968, writ ref. n. r. e.

Appellant relies upon Faville v. Robinson, 111 Tex. 48, 227 S.W. 938 (1921), and quotes from that decision:

"A verbal promise of the character here pleaded and sought to be enforced is not within the Statute of Frauds. Allen v. Allen, 101 Tex. 362, 107 S.W. 528, does not, as the plaintiffs in error urge, hold that it is. The promise is not to convey any existing interest in real estate. It is made as the means of acquiring the interest. The interest is obtained on the faith of it and it enters into the title. Because so, equity will not permit the grantee to hold the title in repudiation of the agreement." (227 S.W. 938, col. 2)

A fiduciary relationship existed in *Faville* in which a daughter "was induced to convey to her mother * * * a certain interest in real estate upon the mother's oral representation and promise. * * *"

Appellant cites Miller v. Himebaugh, 153 S.W. 338, Tex.Civ.App. Amarillo 1913, writ ref. w. o. m., for the principle stated in this language:

"It is said in the books that trusts of this character are created by a desire of equity to enforce honesty and fair dealing. It is thus raised to prevent fraud or to prevent willful violation of fiduciary relations, or which are actually or constructively fraudulent, and is called a trust 'ex maleficio.' The party perpetrating the fraud is made a trustee 'in invitum', and the defrauded party the 'cestui que trust.' " (153 S.W. 342, col. 2)

The fiduciary relationship in Miller v. Himebaugh was between Mrs. Himebaugh and her son-in-law, in whom she "had implicit confidence" when she wholly relied "upon his promise * * *" In that

case the court clearly stated the principle applicable in the case now under consideration in this language: "Where a party through a breach of his trust and *in violation of fiduciary relations* thereby obtains an advantage, equity has power and in many methods to prevent such person from reaping any advantage by such fraud, *whether actual or constructive.*" (153 S.W. 342, syl. 3) (Emphasis added)

Appellant contends, "This case falls within the group of constructive trust cases known as the 'bidding cases.' Thus, 'Special circumstances such as the owner's refraining from bidding or relaxation of efforts to obtain money to prevent the sale, may give rise to a constructive trust in favor of the owner or estop the promisor from relying on the statute of frauds,'" citing 27 A.L.R.2d 1285, 1307.

The only Texas cases we find cited in the annotation are Stone v. Boone, 160 S.W.2d 578, Tex.Civ.App. Fort Worth 1942, writ ref. w. o. m., in which the court found no constructive trust to exist, and Kirkland v. Handrick, 173 S.W.2d 735, Tex.Civ.App. San Antonio 1943, writ ref. w. o. m., in which the court found a constructive trust to exist in favor of a sister as against her brother, who by violation of confidence of their fiduciary relations, had obtained legal title to property the sister was entitled to.

Appellant's second theory of the case is that Craus and Dowd, as well as Phillips Petroleum, were bound to perform the lease obligation in question under the "part performance" exception to the statute of frauds as that rule was announced in Hooks v. Bridgewater, 111 Tex. 122, 229 S.W. 1114, 15 A.L.R. 216 (1921).

The rule was succinctly stated by the Supreme Court in the later case of Matney v. Odom, 147 Tex. 26, 210 S.W.2d 980 (1948): "It is the law of this state that to remove a case from the operation of the statute of frauds, three things are necessary: Payment of the consideration, possession by the vendee, and the making by the vendee of valuable improvements on the faith of the contract, or, in the absence of such improvements, such other facts as would make the transaction a fraud if it were not enforced." (210 S.W.2d 984, col. 2)

In applying the rule, it is settled that payment of the consideration, though it be payment in full, is not sufficient, nor is possession of the premises or the making of valuable improvements sufficient. Each of the three elements is indispensable, for "to hold otherwise would annul the statute." Robertson v. Melton, 131 Tex. 325, 115 S.W.2d 624, 118 A.L.R. 1505 (1938); Tian v. Tacquard, 147 S.W.2d 1114, Tex. Civ.App. Galveston 1941, writ ref.

Appellant was found by Craus and Dowd in possession of Tract I as a tenant of the City of Austin. After the tract was sold to Craus and Dowd, appellant continued to operate its business on the premises and paid rent at the same monthly rate to the purchasers. Thereafter, when Phillips acquired the tract, appellant paid the same rentals to Phillips until the end of the term of the lease under which appellant had become the City's lessee. Appellant was ousted in due course by Phillips when the original lease with the City terminated.

The record does not disclose that appellant ever paid rent to Craus and Dowd, or to Phillips, beyond the term of appellant's lease with the City, or that the amount paid during this term was in an amount different from the rents due under the City lease. Appellant's forbearance to bid on the City tract when it was offered for sale did not constitute rent or other consideration specified in the lease agreement with Craus and Dowd forming the basis of this lawsuit. The record does not show that appellant paid any rent, in advance or otherwise, under the lease agreement with respect to either Tract I or Tract II.

Craus and Dowd did not place appellant in possession of the City tract, since appellant was already in possession of the premises under its lease with the City. There

is nothing in the nature of such possession to suggest the existence of the lease agreement with Craus and Dowd, nor does appellant's continued occupancy of the tract, for the life of the City lease, tend to prove the existence of the lease agreement relied upon by appellant in this suit. Francis v. Thomas, 129 Tex. 579, 106 S.W.2d 257 (1937).

Such improvements as were made on the City tract consisted of paint work on the building and the purchase of a new ice cream machine installed in the building. Even if such work could be termed permanent improvements, which is doubtful, this performance alone, without payment of consideration under the lease and delivery of possession, will not satisfy the requirements of the rule in Hooks v. Bridgewater.

There is no contention by appellant that it ever went into possession of Tract II or that any of the rentals called for under the purported lease were paid. No improvements were made on the tract by appellant, although proof was made that an architect had been employed to draw plans for the building to be erected on Tract II. The lease agreement relied on by appellant did not require appellant to engage an architect or to furnish plans at its expense.

■ In making proof under the rule of Hooks v. Bridgewater, acts of appellant that admit of explanation, without reference to the parol lease agreement sued on, will not constitute proof of part performance. Duke v. Joseph, supra; Cowden v. Bell, 157 Tex. 44, 300 S.W.2d 286 (1957).

■ We do not hold that there has been no fraud worked upon appellant, nor do we find that appellant did not suffer a wrong thereby. But to justify the intervention of equity notwithstanding the statute of frauds, there must be something more than a mere wrong or breach of contract. Meyer v. Texas National Bank of Commerce of Houston, 424 S.W.2d 417 (Tex.Sup. 1968).

After careful examination of the summary judgment proofs, we find that such proofs conclusively negate at least one of the essential elements of appellant's cause of action under either of its two theories of the case. Upon our conclusion that the record establishes appellees' right to summary judgment as a matter of law, we affirm the judgment of the trial court. Gibbs v. General Motors Corporation, 450 S.W.2d 827 (Tex.Sup.1970); Kelsey-Seybold Clinic v. Maclay, 466 S.W.2d 716 (Tex.Sup. 1971).

The judgment of the trial court that appellant, plaintiff below, take nothing is in all things affirmed.

Affirmed.